**ARONSOHN WEINER & SALERNO, P.C.**
263 Main Street
Hackensack, New Jersey 07601
(201) 487-4747
FAX (201) 487-7601
Attorneys for Plaintiff, De Lage Landen Financial Services, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
--------------------------------------------------------------- x
De Lage Landen Financial Services, Inc.,            :        CIVIL ACTION
                                                    :
                        Plaintiff,                  :
                                                    :
            v.                                      :        No. _____
                                                    :
Abe's Electronics Center, Inc. d/b/a Abe's of Maine :
Cameras and Electronics,                            :
                                                    :
                        Defendant.                  :
--------------------------------------------------------------- :
                                                    x
```

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S ORDER TO SHOW
CAUSE FOR A WRIT OF REPLEVIN AND A TEMPORARY RESTRAINING ORDER**

## PRELIMINARY STATEMENT

Counsel for Plaintiff De Lage Landen Financial Services, Inc. ("DLL" or "Plaintiff") submits this brief in support of its application by way of Order To Show Cause, seeking a writ of replevin and temporary restraints, among other relief.  This action is based upon the default of Defendant Abe's Electronics Center, Inc. d/b/a Abe's of Maine Cameras and Electronics ("Abe's", "Borrower", or "Defendant"), under a Loan and Security Agreement (hereinafter the "Agreement") between DLL and Abe's, dated as of December 5, 2008, and upon Abe's breach of a separate Lease Agreement (the "Lease Agreement") between DLL and Abe's. This is an urgent time-sensitive application, and it is respectfully submitted that an immediate order from this Court is needed to prevent the dissipation of DLL's collateral and the jeopardizing of DLL's security interest due to Defendant's defaults and apparent financial crisis.

## STATEMENT OF FACTS

Abe's is a reseller of electronics goods that it purchases from various vendors.  See Affidavit of Alan I. Cohen ("Aff."), para. 4.  Pursuant to the Agreement, DLL agreed to extend to Abe's a continuous line of credit to finance Abe's purchases of inventory and parts.  See Agreement, Pg. 1.   The interest on any loans extended to Abe's by DLL pursuant to the Agreement is set as the prime rate plus 6 percent, for invoices unpaid after standard supplier provided financing terms.  See Agreement, Pg. 13.  DLL has extended various loans to Abe's under the Agreement, typically paying funds directly to product vendors who then supplied inventory to Abe's.  See Aff, para. 7.  The Agreement contains a first purchase money security agreement, whereby Abe's pledged as collateral for its indebtedness to DLL the following: "all of Borrower's assets, including, without limitation, Accounts, Chattel Paper, Deposit Accounts, Equipment, General Intangibles, Instruments, Inventory, Investment Property, Commercial Tort Claims and Proceeds" (herein referred to as the "Collateral").  See Aff, para. 8.  DLL filed an

appropriate UCC financing statement with the state of New Jersey, properly documenting its security interest in the Collateral.  <u>See</u> Aff, para. 9.  The Collateral includes not only Abe's' electronics products inventory but also various units of industrial equipment used by Abe's in its business.  <u>See</u> Aff, para. 10.

The Agreement provides DLL with the right to access Abe's' facilities, at any time, during normal business hours, announced or unannounced, for the purpose of inspecting the inventory held by Abe's.  This provision of the Agreement is essential to DLL's security interest in the inventory.  <u>See</u> Agreement, Pg. 7, para. 9.  The Agreement provides DLL with the right, in the event of a default of the Agreement by Abe's, to immediately repossess all Collateral, including all inventory.  <u>See</u> Agreement, Pg. 9, para. 15.  The Agreement provides DLL with the right, in the event of a default of the Agreement by Abe's, to immediately accelerate the entire balance due from Abe's to DLL and require immediate payment of the accelerated balance.  <u>See</u> Aff, para. 13.

The Agreement provides that Abe's will default on the Agreement in the event that Abe's fails to make a payment to DLL when due, or Abe's denies access to DLL to inspect its inventory, or Abe's fails to notify DLL of a change to Abe's' banking structure with TD Bank, among other events of default.  <u>See</u> Agreement, Pgs. 6 and 8.  The Agreement provides DLL with various remedies in the event of default, including, but not limited to, the unqualified right to immediately enter upon Abe's facilities to repossess the Collateral, and the right to accelerate the entire balance due and to require immediate payment of all amounts due from Abe's.  <u>See</u> Aff, para. 15.

Abe's has defaulted on the Agreement by failing to pay all amounts to DLL when due.  <u>See</u> Aff, para. 16.  Specifically, Abe's failed to make a payment of $215,519 due on June

15, 2012 and failed to make a payment of $646,393.94 due on June 25, 2012.  See Aff, para. 17.

The Borrower also defaulted when it failed to notify DLL of a change to the Borrower's banking

structure with TD Bank.  See Aff, para. 18.  The Borrower also defaulted when it refused to

allow auditors to examine Abe's' books and records, as the Borrower is required to allow per the

terms of the Schedule to the Agreement, at any and all times, during normal business hours.  See

Aff, para. 19.   The Borrower also defaulted when it failed to deliver to DLL financial statements

within 90 days of the fiscal year end.  DLL has still not received fiscal year end December 31,

2011 statements for Abe's.  See Aff, para. 20.  The Borrower also defaulted when it failed to

deliver to DLL quarterly collateral reports, including accounts receivable aging and accounts

payable aging, as requested by DLL.   See Aff, para. 21.   Abe's has also defaulted on the

Agreement by denying access to DLL to inspect its inventory on July 3, 2012, and has prevented

DLL from accessing its facilities for several weeks prior thereto.  See Aff, para. 22.  Abe's has

also defaulted on the Agreement by failing to provide an inventory report to DLL since March

2012, though DLL has repeatedly requested such a report.  See Aff, para. 23.

       In late June 2012, given Abe's defaults that already had occurred and the clear

risks posed to DLL's security interest, DLL requested that Abe Mosseri, the principal of Abe's,

provide a personal guarantee for the company's debt, and he refused.  See Aff, para. 24.  The risk

to DLL's security interest and to its prospects of being repaid the more than $2.4 million that it

has advanced to Abe's, to purchase the inventory that is the subject Collateral, has become

extreme, requiring immediate legal action and relief from this Court.   See Aff, para. 25.

Immediate judicial intervention is needed at this time to prevent Abe's or its employees, owners,

or affiliates from disposing of the Collateral improperly.  See Aff, para. 26.

Abe's' failures and refusals to meet its obligations under the Agreement, especially its default on payments of $862,743.59, its blatant refusal to permit DLL's representatives access to inspect the inventory, its failure to provide quarterly collateral reports, and its failure to provide financial reports when asked, demonstrate the urgency of this situation. See Aff, para. 27.  DLL needs immediate relief – for which the Agreement specifically provides – to safeguard its rights and the Collateral.   See Aff, para. 28.

DLL has contacted Abe's and its principal, Abe Mosseri, frequently in recent weeks to implore Abe's of the seriousness of the situation.  DLL has not received any reasonable level of cooperation from Abe's, but, rather, has met with frustration each time that it has inquired about Abe's' inventory, financial statements, permitting DLL access to its site, or Abe's' ability to repay the amounts owed.  See Aff, para. 29.  At one point in mid-June, Abe Mosseri represented that Abe's had at its disposal funds with which to make a payment to DLL. However, days later, he advised that the company no longer had those funds.  See Aff, para. 30. On June 22, 2012, Abe Mosseri directly refused DLL's requests to speak with Abe's accountant and TD Bank regarding Abe's financial situation.  See Aff, para. 31.  On June 22, 2012, Abe Mosseri directly refused DLL's request to enter and inspect Abe's' warehouse, and refused to sign a personal guarantee for the debt.  See Aff, para. 32.  When a DLL representative was last allowed access to Abe's' warehouse, he was not permitted to take inventory counts or take pictures, which is in violation of the Agreement and defeats the purpose of DLL's visit and jeopardizes its security interest.  See Aff, para. 33.

Every attempt that DLL has made to work out a new payment arrangement or settlement with Abe's has failed, as Abe's clearly does not have the financial or business capability to meet its substantial payment obligations to DLL.  See Aff, para. 34.  By letter dated

4

June 25, 2012 to Abe's (attn: Abe Mosseri), counsel for DLL notified Abe's that it was in default of the Agreement for having failed to make required payments to DLL, when due, and that the total amount by which Abe's was behind in payments was $862,743.59.  See Aff, para. 35.   On July 3, 2012, representatives from DLL and DLL's collateral agent arrived at Abe's' facilities to conduct an on-site inventory inspection, but Abe Mosseri himself refused to permit them entry, a clear breach of the Agreement, and a red-flag to all concerned that Abe's' business and DLL's security interest are in serious jeopardy.  See Aff, para. 36.

The present total accelerated amount due from Defendant to Plaintiff, as a result of the default, is $2,426,089.65, plus continually accruing late fees and other fees, interest and attorneys' fees, costs and expenses.  See Aff, para. 37.   Under the Agreement, Abe's is liable to DLL not only for repayment of any loans extended under the Agreement, but also for interest, late fees and other fees, costs and expenses, including attorneys' fees and legal costs, incurred by DLL in enforcing its rights under the Agreement.  See Agreement, Pgs. 8-9.

DLL and Abe's also entered into a separate Lease Agreement on December 21, 2010.  See Aff, para. 39.  By the Lease Agreement, DLL agreed to finance Abe's' purchase of certain industrial equipment, used by Abe's in its business, including several Conveyors.  A complete list of such equipment financed under the Lease Agreement is attached as Schedule A to the Lease Agreement.  See Aff, para. 40.  The Lease Agreement contains a provision, at paragraph 14, stating that Abe's will be in default of the Lease Agreement's terms in the event that Abe's breaches "any other agreement" that it has with DLL.   See Aff, para. 41. Accordingly, the Lease Agreement and the Agreement are cross-collateralized, such that default of the Agreement constitutes default of the Lease Agreement, and such that the collateral provided for in one contract constitutes collateral for the other contract.  See Aff, para. 42.

Under the Lease Agreement, Plaintiff retained title to the equipment that was pledged as collateral for the Lease Agreement, the purchase of which DLL financed.  See Aff, para. 43.  Under the Lease Agreement, in the event of default, Plaintiff is entitled to recover damages, and to immediately seize the equipment that was pledged as collateral for the Lease Agreement.  See Aff, para. 44.  The Lease Agreement provides DLL with the right, in the event of a default of the Lease Agreement by Abe's, to immediate accelerate the entire balance due from Abe's to DLL and require immediate payment of the accelerated balance.  See Aff, para. 45.

Under the Lease Agreement, Abe's is liable to DLL not only for repayment of any money due under the Lease Agreement, but also for interest, late fees and other fees, costs and expenses, including attorneys' fees and legal costs, incurred by DLL in enforcing its rights under the Lease Agreement.  See Aff, para. 46.  Under the Lease Agreement, Defendant owes DLL over $120,605.31.  See Aff, para. 47.

## <u>ARGUMENT</u>

**DLL HAS A SECURITY INTEREST IN THE COLLATERAL AND IS LEGALLY AND CONTRACTUALLY ENTITLED TO REPLEVY THE COLLATERAL**

Rule 64 of The Federal Rules of Civil Procedure entitled Seizing a Person or Property states:

> (a) Remedies Under State Law — In General.
>
> At the commencement of and throughout an action, every remedy is available that, *under the law of the state where the court is located*, provides for seizing a person or property to secure satisfaction of the potential judgment.  But a federal statute governs to the extent it applies.
>
> (b) Specific Kinds of Remedies.
>
> The remedies available under this rule include the following — however designated and regardless of whether state procedure requires an independent action:    arrest; attachment; garnishment; *replevin*; sequestration; and other corresponding or equivalent remedies.

Fed. R. Civ. P. 64.  (emphasis added).

Under Rule 64, it is a "long-settled . . . that in all cases in federal court, . . . state law is incorporated to determine the availability of prejudgment remedies for the seizure of person or property to secure satisfaction of the judgment ultimately entered."  *Granny Goose Foods. Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 436 n.10 (1974) (citing Fed. R. Civ. P. 64); *Tucker v. New York Police Dept.*, 2009 WL 936860, at *1 (D.N.J. Apr. 6, 2009) ("Fed. R. Civ. P. 64 provides that all remedies available under the law of the state where the court is located which provide for the seizure of a person's property to secure satisfaction of a potential judgment are available in federal court").  *See also Berk v. HMC*, 2009 WL 467849, at *2-4 (D.N.J. Feb. 24, 2009) (applying New Jersey state law to determine whether prejudgment remedy of attachment was warranted).

New Jersey law, which is applicable here for purposes of determining prejudgment remedies, provides for the seizure of property improperly held by another.  In particular, N.J.S.A. 2B:50-1 enables a party seeking to recover goods wrongfully held by another to bring an action for replevin.  It provides as follows:

> A person seeking recovery of goods wrongfully held by another may bring an action for replevin in the Superior Court.  If the person establishes the cause of action, the court shall enter an order granting possession.

N.J.S.A. 2B:50-1.  If the Court finds that the party seeking replevin has demonstrated a "probability of final judgment," the Court may grant possession of the goods to the moving party before entry of final judgment.  N.J.S.A. 2B:50-2 ("If the court, after notice and hearing, and based upon filed papers and testimony, if any, finds a probability of final judgment for the plaintiff, it may, prior to final judgment:  (a) grant possession of the goods to the plaintiff; or (b) order other just relief").  There is no other showing required under New Jersey law, and therefore under applicable federal law, to obtain pre-judgment possession.  *See also* N.J. Ct. R. 4:61-1(a) (a motion for writ of replevin "shall be granted only upon the court's finding, based on the moving papers, any opposing affidavits which may have been filed, and any testimony taken pursuant to R. 1:6-6, that there is a probability that final judgment will be rendered in favor of the movant").

A secured party has the right to take possession of its collateral upon default.  N.J.S.A. 12A:9-609 states, in relevant part:

> Secured party's right to take possession after default.
>
> (a) Possession; rendering equipment unusable; disposition on debtor's premises.  After default, a secured party:
>
> > (1) may take possession of the collateral; and
> >
> > (2)  without removal, may render equipment unusable and dispose of

collateral on a debtor's premises under 12A:9-610.

(b) Judicial and nonjudicial process. A secured party may proceed under subsection (a):

(1) pursuant to judicial process; or

(2) without judicial process, if it proceeds without breach of the peace.

(c) Assembly of collateral. If so agreed, and in any event after default, a secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties.

N.J.S.A. 12A:9-609.

In addition, the Agreement and Lease Agreement each expressly permit DLL to pursue any remedies available under state law, and each specifically allow DLL to enter Abe's' premises to inventory and repossess the Collateral, immediately, in the event of default.

DLL has clearly demonstrated a "probability of final judgment," and therefore has an undeniable right to possession of the Aircraft by virtue of its security interest in the Aircraft and JSM's defaults under the Loan and Security Agreement.

It is a well-established principle that a clear, complete and unambiguous contract should be enforced according to the plain meaning of its terms. *See John M. Floyd & Assoc. v. Ocean City Home Sav. Bank*, 206 Fed. Appx. 129, 133 (3d Cir. 2006) (stating that "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and we must enforce those terms as written." (internal quotations omitted)), *Pocono Realty Co. v. Lamar Adver. Co.*, 395 Fed. Appx. 903, 906 (3d Cir. 2010) ("When a writing is clear and unequivocal, its meaning must be determined by its contents alone . . . . In the absence of an ambiguity, the plain meaning of the agreement will be enforced" (internal quotations omitted)).

The Agreement and Lease Agreement provide, in unambiguous terms, that if an Event of Default occurs, DLL may repossess any and all Collateral, immediately, and that DLL

9

is also entitled to enter Abe's' premises to account for the Collateral, at any time.   As demonstrated in the Affidavit submitted with this application, Defendant has committed serious breaches of the Agreement and Lease Agreement, including failures to pay large sums of money due to DLL, failures to provide financial and collateral accounting statements, and refusal to permit DLL to enter Abe's' premises to view the Collateral.  These defaults entitle DLL to take possession of the Collateral, under a writ of replevin, and certainly, given the serious risk to DLL's security interest now posed, these defaults entitle DLL to an immediate temporary restraining order to prevent dissipation of the Collateral and allow DLL to account for all such Collateral.

### DLL IS ENTITLED TO A TEMPORARY RESTRAINING ORDER UNTIL HEARING ON THE WRIT OF REPLEVIN

In addition to Plaintiff's request for a writ of replevin, a temporary restraining order should be issued to preserve the *status quo* until the parties' rights with respect to the Collateral can be determined at a hearing.

It is well-established that a plaintiff is entitled to a temporary restraining order where it establishes four factors: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest."  *New Jersey Retail Merch. Ass'n v. Sidamon-Eristoff*, 2012 U.S. App. LEXIS 130, at *12 (3d Cir. Jan. 5, 2012); *see Ameriprise Fin. Serv. v. Koenig*, 2012 U.S. Dist. LEXIS 13864, at *11 (D.N.J. Feb. 6, 2012), *Otiogiakhi v. Aamco Transmissions, Inc.*, 2011 U.S. Dist. LEXIS 132601, at *9-*10 (D.N.J. Nov. 17, 2011).  As demonstrated below, each of the requisite elements is met in this case.

**A.      DLL is Likely to Succeed on the Merits**

As more fully discussed *supra,* DLL will in all probability succeed on its replevin claim because there is no question that DLL has fulfilled all of the requirements of N.J.S.A. 2B:50-1, N.J.S.A. 2B:50-2, and N.J.S.A. 12A:9-609.  DLL has established that it has a security interest in the Collateral and that Defendant is in default of its obligations to DLL.  Moreover, the terms of the parties' agreements, as well as the provisions of New Jersey law, are clear and unambiguous concerning DLL's right to immediate possession of the Collateral.  Accordingly, DLL has more than adequately demonstrated that it is likely to succeed on the merits of its replevin claims.

**B.      DLL Will Suffer Irreparable Harm if Abe's Is Not Required to Refrain from Disposing of the Collateral and to Permit DLL to Account for the Collateral**

DLL will suffer irreparable harm if a temporary restraining order is not granted. As set forth in the Affidavit submitted with this application, DLL is exposed to irreparable injury based on the potential dissipation of the Collateral by Defendant or people associated with Defendant.  The serious breaches of the parties' agreements demonstrate the gravity of Abe's financial crisis and the immediate risk to DLL's security interest.  The fact that the principal of Defendant himself has refused to permit DLL to enter Abe's' premises to view the Collateral demonstrates that the Collateral itself is in serious jeopardy.  Moreover, the fact that Defendant has refused to provide financial of collateral statements for months now illustrates the great threat to DLL's rights in this matter.  The very fact that Defendant owed over $2 million and is behind in payments by almost $1 million raises a red flag that immediate relief is necessary to avoid any further harm to DLL's interests.

### C.      No Greater Harm to the Non-Moving Party

Granting DLL a temporary restraining order would result in no greater harm to Abe's because, under the express provisions of the parties' agreements, Abe's has no right to the continued possession and use of the Collateral.  *See, e.g.*, *Otiogiakhi*, 2011 U.S. Dist. LEXIS 132601, at *22 (holding that "Plaintiff cannot suffer legally cognizable harm in being precluded from exercising rights that he does not lawfully possess").  As explained in the Statement of Facts, Abe's has committed numerous and serious breaches resulting in Events of Default under the parties' agreements.  These Events of Default entitle DLL to exercise its remedies under the agreements, including its right to terminate Abe's' rights to the Collateral and take immediate possession of same.

In addition, any harm that would result to Abe's is the result of Abe's' own non-compliance and breach of the agreements and attempt to avoid its obligations under the agreements.  *See, e.g.*, *Otiogiakhi*, 2011 U.S. Dist. LEXIS 132601, at *22 ("The Third Circuit has held that '[a] party's self-inflicted harm by choosing to stop its own performance under contract and thus effectively terminating the agreement is outweighed by the immeasurable damage done to the franchisor of the mark.'  Therefore, any self-inflicted harm that [the non-moving party] suffers as the result of his deficient performance is outweighed by the irreparable injury suffered by [the moving party] in the infringement of its trademark, damage to good-will, and loss of control of its reputation." (internal citations omitted)).  In this case, any harm that Abe's may suffer as a result of its breach of the agreements is outweighed by the irreparable injury DLL would suffer as a result of the improper dissipation of the Collateral, which is likely to be imminent.

**D.     Granting DLL a Temporary Restraining Order Would Promote the Public Interest**

Courts have recognized that it is in the public interest to enforce a contract according to the plain meaning of its terms in order to give effect to the parties' bargained for rights.  *See Arch Pers. Care Prod., L.P v. Malmstrom*, 90 Fed. Appx. 17, 21 (3d Cir. 2003) (affirming grant of a preliminary injunction and finding that the restrictions imposed "were within the public's interest in the enforcement of contracts according to the terms included by the parties"), *King Pharm., Inc. v. Corepharma, LLC*, 2010 U.S. Dist. LEXIS 45660, at *13 (D.N.J. May 7, 2010) (finding that granting a preliminary injunction would be in the public interest because "[t]he public interest generally weighs in favor of enforcing private contracts.").  Abe's has undoubtedly breached the agreements and, therefore, under their express terms, DLL is entitled to terminate Abe's' rights in the Collateral and take immediate possession of same.  The agreements at issue were negotiated between sophisticated parties represented by counsel, and the Court should hold the parties to the clear and unambiguous terms of their agreement and enforce the contract as written.

**<u>CONCLUSION</u>**

For all of the foregoing reasons, Plaintiff respectfully requests that the Court issue a writ of replevin and preliminary injunction, and grant a temporary restraining order until hearing and decision on the writ of replevin and preliminary injunction.

Dated: July 6, 2012                ARONSOHN WEINER & SALERNO, P.C.
Attorneys for Plaintiff
De Lage Landen Financial Services, Inc.


By:     <u>/s   Gerald R. Salerno</u>
Gerald R. Salerno
gsalerno@aronsohnweiner.com
263 Main Street
Hackensack, NJ 07601
Phone:  201-487-4747
Fax:  201-487-7601